IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MARCIAL A. AVILA,

      Plaintiff,

vs.                                              Case No. 06-4123-SAC

JOSTENS, INC.,

      Defendant.

## MEMORANDUM AND ORDER

This case comes before the court on defendant's motion for summary judgment. Plaintiff contends he was discriminated against in terms and conditions of his employment and in the termination of his employment because of his national origin (Mexican), and that his termination was in retaliation for his having complained of that discrimination. Dk. 25, p. 1.

**Summary Judgment Standard**

On summary judgment, the initial burden is with the movant to point out the portions of the record which show that the movant is entitled to judgment as a matter of law. *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.1992), *cert. denied*, 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the non-movant must set forth specific facts which would be admissible as evidence from

which a rational fact finder could find in the non-movant's favor. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir.1998). The non-movant must show more than some "metaphysical doubt" based on "evidence" and not "speculation, conjecture or surmise." *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bones v. Honeywell Intern.*, 366 F.3d 869, 875 (10th Cir.2004). The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether the evidence is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**Facts**

This case has been submitted to the court on the following uncontested facts. Plaintiff was born in Mexico and came to the United States in 1984.  He has not made an effort to learn to speak or write in English. Plaintiff claims that he can only speak, read and understand a little bit of English, despite having lived in the United States for 23 years. Plaintiff applied for employment with Jostens in March of 1995.  He then participated in an interview, and he did not require an interpreter. During

2

the hiring process, Plaintiff informed a Jostens representative that he was from Mexico. Plaintiff was hired by Jostens as a seasonal employee shortly after he submitted his application.

Plaintiff worked in the bindery department, where, at the beginning of his employment, no other bindery employees spoke Spanish. Plaintiff received his daily work instructions in English. Plaintiff's job duties included counting books, packing them into boxes, printing labels and affixing them to the correct boxes for shipping.

While employed by Jostens, Plaintiff joined the Graphic Communications Union and received a copy of the collective bargaining agreement entered into between the Union and Jostens. The Union did not provide him with an interpreter to read the document to him. Plaintiff attended Union meetings but claims he could not understand what was being said at those meetings. When the Union president communicated with Plaintiff, he spoke to Plaintiff in English. Union officials conceded they might have told Plaintiff that he would benefit from learning to speak English.

In 2002, Plaintiff referred his brother-in-law and his daughter, both of whom were born in Mexico, for employment at Jostens and both were

hired. Plaintiff's brother-in-law does not speak English but is still employed by Jostens, and plaintiff's daughter chose to leave that job. Barbara Alcantar, Josten's Human Resources manager during plaintiff's employment, was married to Raul Alcantar, a Hispanic Jostens employee. Mr. Alcantar spoke Spanish and interpreted conversations between Ms. Alcantar and Plaintiff on at least one occasion.

Jim Keefe was a supervisor in the bindery during part of plaintiff's tenure at Jostens. From the beginning of his employment in 1995 until 2003, plaintiff did not file any grievances, and the Union did not file any grievances on his behalf. From October 1, 2001, through September 18, 2003, the Union filed at least 21 grievances against Mr. Keefe concerning actions taken against white, black, and Hispanic employees, including a suspension of the Union president, Mike Vannordstrand. Vannordstrand personally disliked Mr. Keefe and thought that Mr. Keefe should be terminated.

From September 1, 2001, through September 30, 2003, Jostens terminated 76 employees for disciplinary reasons. Those terminated included employees who were white, black, Indian, Hispanic, and Asian.

In August, 2000, plaintiff received a "verbal warning" from a

4

supervisor other than Mr. Keefe regarding the quality of plaintiff's work. Plaintiff had failed to accurately count the books for an order, which led to a short shipment to the customer and a reprint of the missing books. Plaintiff signed the warning and did not have someone read it to him. The written disciplinary action notice of the warning stated, immediately before the signature line, "Failure to improve your quality will result in further disciplinary action, up to and including termination."  Dk. 31, Exh. 6.

In February, 2001, Plaintiff received a "verbal warning" from a supervisor other than Mr. Keefe regarding his productivity. He was warned that his productivity was "extremely slow" and "not acceptable," and that he was not productive during his entire shift. Plaintiff understood the warning and did not have anyone read it to him, but refused to sign it because he did not agree with it. Plaintiff did not complain to anyone that he felt he received this warning because of his national origin.  The written disciplinary action notice of the warning stated, immediately before the signature line, "Failure to improve your quality will result in further disciplinary action, up to and including termination."  Dk. 31, Exh. 7.

 In August, 2001, Plaintiff received a "verbal warning" from a supervisor other than Mr. Keefe regarding the quality of his work. Plaintiff's

acts had caused "a great deal of trouble for the customer." Dk. 31, Exh. 8. The documentation of this warning states, "additional problems will result in additional disciplinary action up to and including termination," and notified plaintiff that he was disqualified form receiving his merit pay. *Id.* Plaintiff signed and understood this warning without having anyone read it to him, and did not complain to anyone that he felt he received this warning because of his national origin.

In August, 2001, Plaintiff received his annual performance review from supervisor Eric Steinmetz. Plaintiff received an overall performance rating of "unacceptable," meaning that he "demonstrate[d] performance that consistently fail[ed] to meet targeted requirements in several areas." Dk. 31, Exh.9. Plaintiff's merit pay raise evaluation was rated at .3 out of a possible 2.0, or "needs improvement." Plaintiff signed his evaluation and his merit pay evaluation form. Plaintiff knew in 2001 that he could make a complaint to the Human Resources department if he felt he was being discriminated against, but he did not make any such complaint in 2001.

In September of 2002, plaintiff received a 1.0 (rated "on target") on his merit pay evaluation form, completed by Mr. Keefe. Plaintiff did not have any problems with Mr. Keefe during 2002. Dk. 31, Exh. 12.

6

In February of 2003, plaintiff received a "verbal warning" from supervisor Keefe based on poor quality because he had committed what was deemed to be a "serious problem." Plaintiff signed the warning form and did not have anyone read it to him. Plaintiff did not complain to anyone that he received this warning because of his national origin. When plaintiff signed this disciplinary form, he understood its warning that if he had further quality problems, he would be disciplined, which could include termination.

In May of 2003, Plaintiff received a written warning from supervisor Keefe for "personal conduct/quality/insubordination" based on a machine operator's report that Plaintiff was not checking the top book in each stack that came off the line, which was part of his job duties. The operator also reported that plaintiff kicked some boxes and glared at her, although plaintiff denies such conduct. Plaintiff was warned that further incidents of that nature would result in further disciplinary action, up to and including termination, and was suspended for the rest of the day as a result of this incident.  Plaintiff believes he was falsely accused of kicking the boxes, but does not believe that the operator tried to get him in trouble because of his national origin.

When this incident was reported, plaintiff met with Mr. Keefe, the line supervisor, and two union representatives. Ms. Barbara Alcantar and another employee who spoke Spanish and interpreted for plaintiff came to the meeting later. Plaintiff understood what Mr. Keefe said to him during the meeting even without the interpreter. During this meeting, Mr. Keefe stated that because plaintiff lived in the United States, he should learn to speak English, or words to that effect. Mr. Keefe alleges he was frustrated with the lack of communication in English, not with the fact plaintiff's national origin was Mexican. Mr. Keefe did not mention the fact that plaintiff was from Mexico. Plaintiff was upset by Mr. Keefe's remark. During the May, 2003, meeting, Ms. Alcantar told Mr. Keefe that his comment about learning to speak English was inappropriate, and Ms. Alcantar apologized for his comment.

In August of 2003, plaintiff was ranked as being "on target" on his evaluation form completed by Mr. Keefe. Dk. 31, Exh.15. On August 25, 2003, Plaintiff was given a "pretermination warning" and a three-day suspension for poor quality of his work, issued by Mr. Keefe. Plaintiff did not have anyone read the warning to him and he refused to sign it, although he admitted that he made the error at issue. The document

warned plaintiff that any further quality issues during the next year would result in termination.

On September 9, 2003, Plaintiff received a last-chance pretermination warning from a supervisor other than Mr. Keefe regarding the quality of plaintiff's work and his personal conduct. The document specifically advised plaintiff that "any further issues, regardless of severity," would result in termination. Dk. 31, Exh.17.

On September 11, 2003, Plaintiff failed to check the top book of each stack as he placed the books in boxes. As a result, Plaintiff failed to catch a quality problem with the entire order of over 900 books. If this incorrect order had been shipped, Jostens' account with the customer, valued at $35,000.00, would have been jeopardized. Plaintiff's supervisor had previously spent nearly an hour with him, trying to ensure that Plaintiff understood his job duties. When asked if he understood the expectations prior to beginning his task, Plaintiff replied that he did. Plaintiff knew that he, among other employees, was responsible to check the quality of books before he packed them.

On September 12, 2003, Plaintiff was terminated on the stated basis of repeated quality and performance deficiencies. Ms. Alcantar participated

9

in the decision to terminate plaintiff, but the record fails to show which, if any, other employees also participated in that decision. The disciplinary action notice is signed by supervisor Keefe and a Human Resources employee other than Ms. Alcantar. Dk. 31, Ex.18.

The Union filed grievances on plaintiff's behalf challenging his three-day suspension, his last chance warning issued on September 9, 2003, and his termination. None of the grievances was processed beyond the initial stage because plaintiff filed a Charge of Discrimination with the Kansas Human Rights Commission which the union believed terminated its jurisdiction.

**Discrimination**

Defendant seeks summary judgment on plaintiff's claim that he was discriminated against in terms and conditions of his employment (disciplinary matters) and in the termination of his employment because of his national origin. Title VII makes it unlawful to discharge or discriminate against an individual based on national origin. 42 U.S.C. § 2000e-2(a).

Plaintiff presents no direct evidence of discrimination, thus the court applies the familiar three-part test established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Penry*

*v. Fed. Home Loan Bank*, 155 F.3d 1257, 1263-64 (10th Cir.1998).

> This structure requires the plaintiff to first establish a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. Should the plaintiff succeed in proving a prima facie case, the employer must provide a legitimate and facially non-discriminatory reason for its decision. *Id.* Finally, if the employer satisfies this burden, the plaintiff must establish that the defendant's reasons were a pretext for discrimination. *Id.* at 804, 93 S.Ct. 1817.

*Somoza v. University of Denver*, 513 F.3d 1206, 1211 (10th Cir.2008).

> Plaintiff's burden to establish a prima facie case of discrimination is

well established.

> A prima facie case of racial discrimination based upon disparate treatment requires a plaintiff to show: "(1) that [s]he is a member of a [protected class], (2) that [s]he suffered an adverse employment action, and (3) that similarly situated employees were treated differently." *Trujillo v. Univ. of Colo. Health Sciences Ctr.*, 157 F.3d 1211, 1215 (10th Cir.1998). In the context of a Title VII discrimination claim, an adverse employment action is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir.2007) (quotation omitted).

*Juarez v. Utah,* 2008 WL 313671, *8 (10th Cir. 2008).[1] The court will

assume, without deciding, that plaintiff has made a prima facie case of

---

[1] Although in certain cases, discriminatory acts by other supervisors may be relevant, *see Sprint/United Management Co. v. Mendelsohn*, __ U.S. __, 128 S.Ct. 1140,  2008 WL 495370, *6 (2008) (ADEA reduction-in-force case) no such acts are alleged here.

discrimination.[2]

Assuming that plaintiff has made a prima facie case of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for plaintiff's termination. *Perry v. Woodward*, 199 F.3d 1126, 1135 (10th Cir.1999). That burden is neither onerous nor empty. *See Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1279 (10th Cir.1999) (recognizing employer's burden is "exceedingly light"). Defendant has met this burden by stating that the reason for plaintiff's disciplinary actions and ultimate termination was unsatisfactory job performance. Poor job performance is a "quintessentially legitimate and nondiscriminatory reason for termination." *Bryant v. Farmers Ins. Exchange*, 432 F.3d 1114, 1125 (10th Cir.2005).

Therefore, the burden shifts back to plaintiff to show a genuine dispute of material fact as to whether defendant's assertion of unsatisfactory job performance is pretextual. Pretext may be shown by

---

[2]Defendant asserts that plaintiff has failed to make a prima facie case because it is plaintiff's burden to show that he was meeting the employer's legitimate job expectations and that similarly situated individuals not in the protected class were treated more favorably. Dk. 26/31, p.10. The court disagrees, and examines those factors in its analysis of pretext. *See McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir.2006).

demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence" and therefore infer that the employer's actions were not for the reasons given. *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir.2006); *Plotke v. White*, 405 F.3d 1092, 1102 (10th Cir.2005) (quotation omitted).

Typically, a plaintiff attempts to demonstrate pretext in one or more of three ways:

> (1) with evidence that the defendant's stated reason for the adverse employment action was false, (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances, or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff."

*Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1230 (10th Cir.2000) (internal citations omitted). Plaintiff attempts to show pretext by showing that the defendant's stated reason for the adverse employment action was false.

### Disparate discipline

Plaintiff first asserts that non-Hispanic employees were treated more

favorably than he when they violated the same work rule. Specifically, plaintiff contends that the machine operator, the other boxer, and the quality inspector, who were all white, also failed to notice that over 900 books were scratched on September 11, but did not receive even a verbal warning. Plaintiff's failure to notice the scratches was the final event leading to his termination.

Even assuming that these employees served under the same supervisor, shared the duty to check the books, and were in a position to have noticed the scratches on the books, no evidence shows that any of those employees had received a last chance warning prior to failing in their duty, or otherwise had a similar disciplinary record to plaintiff. *See Cuenca v. University of Kansas*, 101 Fed.Appx. 782, 790, n. 4 (10th Cir. 2004) (rejecting comparisons with others who did not receive as harsh discipline as did plaintiff because evidence failed to show others committed same offenses to same degree as did plaintiff). Plaintiff has failed to show that these comparators were similarly situated to him. Individuals are considered "similarly situated" when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of "comparable seriousness."

14

*McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir.2006); *Lollis v. City of Eufaula,* 249 Fed.Appx. 20, 26, 2007 WL 2753053, 6 (10th Cir.2007). "Work histories, company policies applicable to the plaintiff and the comparator, and other relevant employment circumstances should be considered when determining whether employees are similarly situated. *Green v. New Mexico*, 420 F.3d 1189, 1194 (10th Cir. 2005), citing *Kendrick*, 220 F.3d at 1232.  Accordingly, disciplinary histories of the comparators and the plaintiff must be substantially similar. *See McWilliams v. Ruskin Co.*, 2006 WL 2795619, 10 (D.Kan.2006) (finding the comparator not similarly situated where his disciplinary record was unlike the plaintiff's); *Gutierrez v. Board of County Com'rs, Shawnee County, Kan.*,791 F.Supp. 1529, 1535 (D.Kan.1992) (finding no evidence of pretext because the two employees were not similarly situated since plaintiff had a previous disciplinary complaint while the other employee had none).

### Job performance

Plaintiff additionally claims that pretext is shown because he was rated "exceptional" on his annual performance evaluation in August of 2003, only one month before his termination. The Tenth Circuit has previously found evidence of pretext based, in part, on "glaring

contradictions" between the plaintiff's evaluations and the employer's proffered reason for taking the adverse action. *Green v. New Mexico,* 420 F.3d 1189, 1193 (10th Cir. 2005), *quoting Cole v. Ruidoso Mun. Schs.*, 43 F.3d 1373, 1380 (10th Cir.1994).

The record shows, however, that plaintiff's annual performance evaluation in August of 2003 did not rate plaintiff "exceptional," but merely "on target." Defendant concedes that the "Jostens Values" column on the evaluation form should have reflected a "2" instead of a "1," since plaintiff was on target in all four other components. Nonetheless, plaintiff errs in doing his math, as changing the "1" in that column to a "2" produces an overall rating of 1.55 ("on target"), not 1.65 as plaintiff believes, which would have been "exceptional." See Dk. 31, Exh. 15 (showing ratings of 1.00 - 1.59 as "on target.") None of plaintiff's annual performance evaluations included in the record reflects a rating of "excellent."

Additionally, defendant counters that in the weeks after the performance evaluation was completed, events happened which, in conjunction with plaintiff's prior errors, well warranted termination. Defendant supports this contention with sufficient documentation to support a belief that plaintiff committed significant errors leading to three separate

disciplinary incidents during those weeks. *See* Dk. 31, Exh. 16-18. It is not the court's role to second guess an employer's business judgment. *Stover v. Martinez,* 382 F.3d 1064, 1076 (10th Cir. 2004).

> "The relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs." (Citation omitted.) "In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear to the person making the decision." *Watts v. Norman*, 270 F.3d 1288, 1295 (10th Cir.2001) (internal quotation marks omitted). "An articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment." *McKnight*, 149 F.3d at 1129; *see also Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1268-69 (10th Cir.2004) (employer's good faith belief "would not be pretextual even if the belief was later found to be erroneous") (internal quotation marks omitted).

*Rivera v. City and County of Denver,* 365 F.3d 912, 924 -925 (10th Cir. 2004).

Plaintiff has not shown that the supervisors who issued his various disciplinary warnings did not honestly believe the reasons given for the discipline at the time the warnings were issued to plaintiff. Nor has plaintiff shown that the events which were documented following his annual evaluation were so insubstantial as to raise an inference that the resulting discipline or his ultimate termination was pretextual.

### Bad faith

Plaintiff next contends that pretext is shown by defendant's lack of good faith, evidenced in supervisor Keefe's comment during the May 2003 meeting to plaintiff that he should learn to speak English.

Assuming, without deciding, that the comment evidences national origin animus,[3] no pretext has been shown. One isolated remark made several months before plaintiff received notice of his termination does not create a genuine issue of material fact concerning the employer's motivation. *Proctor v. United Parcel Service,* 502 F.3d 1200, 1214 (10th Cir. 2007); *Cone v. Longmont United Hosp. Ass'n ,*14 F.3d 526, 531 (10th Cir.1994).

Nor is there a showing of any nexus between this comment and the disputed employment decisions. *See Stover v. Martinez,* 382 F.3d 1064,

---

[3]*See Dang v. Inn at Foggy Bottom*, 85 F.Supp.2d 39, 42 (D.D.C. 2000) (finding employer's inquiry into plaintiff's national origin (Vietnamese) and her direction that plaintiff speak English in the workplace do not facially reflect racial animus). English-only policies have repeatedly withstood challenge under Title VII. *See e.g., Montes v. Vail Clinic, Inc.*, 497 F.3d 1160 (10th Cir. 2007); *Tran v. Standard Motor Products, Inc.*, 159 L.R.R.M. (BNA) 2107, 74 Empl. Prac. Dec. (CCH) ¶45621 (D. Kan. 1998) (finding language policy was instituted for legitimate business reasons to ensure that all employees and supervisors could understand each other during meetings, to prevent injuries through effective communication on the production floor, and to prevent non-Vietnamese employees from feeling that they were being talked about).

1075 (10th Cir. 2004); *Shorter v. ICG Holdings, Inc.*,188 F.3d 1204, 1209

-1210 (10th Cir.1999)*; See also Hong v. Children's Memorial Hosp.*, 993

F.2d 1257, 1266 (7th Cir. 1993) (employer's telling a Korean employee to

"learn to speak English" did not present evidence of discriminatory animus

because plaintiff did not link the comment to the decision to fire her);

*Morales v. Dain, Kalman & Quail, Inc.*, 467 F.Supp. 1031, 1040 (D.

Minn.1979) (supervisor's telling Cuban employee to "speak English" did not

make out a case of employment discrimination based on national origin).

Curiously, plaintiff volunteers that he "had no problems" with Mr.

Keefe in 2002.  Plaintiff also believes that Mr. Keefe gave him an

"excellent" annual job evaluation just one month before he was terminated,

exhibiting no national origin bias at that time. Plaintiff has offered no reason

why a supervisor would suddenly develop national origin bias or choose to

base his performance decisions on such a bias when he had not done so

just one month earlier, or throughout several years of prior supervision of

the plaintiff. It seems doubtful that the same person who supervises a

person of Mexican origin with no problems for over a year would discipline

or terminate the same employee as result of sudden aversion to persons of

Mexican origin. The record does not support the plaintiff's tacit request that

19

the court impute to the decisionmaker an invidious motivation inconsistent with his prior ongoing acts.

The record additionally shows that supervisors other than Mr. Keefe documented significant problems with plaintiff's performance. Disciplinary warnings to plaintiff in August of 2000, February of 2001, August of 2001 and September of 2003 were all issued by supervisors other than Mr. Keefe. Similarly, plaintiff's 2001 annual performance evaluation which ranked plaintiff's work as "unacceptable," was issued by a supervisor other than Mr. Keefe. The fact that other supervisors shared the belief that plaintiff's job performance was poor tends to refute plaintiff's assertion that the disciplinary actions initiated by Keefe and plaintiff's termination were a product of discriminatory bias.

The court has reviewed the depositions and other exhibits offered by plaintiff in support of his response. The record shows that Mr. Frickey, an operator, heard Mr. Keefe say a couple of times that if plaintiff couldn't speak English, he should get out of the country. Mr. Frickey also thought Mr. Keefe seemed pleased about getting plaintiff terminated. Mr. Frickey testified that Mr. Keefe treated perhaps half of all employees unfairly, but he believed that gender and race made a difference to Mr. Keefe since he

had once heard Mr. Keefe make a racially disparaging remark about a black man. The Tenth Circuit has consistently held that "unsupported assertions by an employee that an employer's actions are based on his race are insufficient to avoid summary judgment. (Citation omitted)." *Domai v. Discover Financial Services, Inc.*, 244 Fed.Appx. 169, 174, 2007 WL 1723610, 5 (10th Cir. 2007).

Plaintiff additionally attributes some derogatory comments to Mr. Keefe regarding African-Americans vacationing in Africa, but the cited record fails to show that Mr. Keefe ever made any such comments. *See* Dk. 34, p. 12, citing Exh. 3, p. 33. Plaintiff asserts that Mr. Keefe made other disparaging comments regarding Mexicans, but the cited pages of deposition testimony are not included in the record. *See* Dk. 34, p. 16, citing Exh. 5 p. 36-37.

The court has also carefully reviewed the other attached exhibits. The co-workers' testimony, read in the light most favorable to plaintiff, is largely to the effect that the deponents worked with plaintiff, did not see plaintiff commit errors, thought he did his job well, were able to communicate with him in English sufficiently to do their jobs, and thought other employees were not disciplined but had committed similar errors. The record fails to

show that these persons were supervisors or were otherwise in any position to evaluate plaintiff's work, to assess others' errors, or to have knowledge of others' work and disciplinary histories.

Similarly, the court has reviewed the testimony by Barbara Alcantar and Mike Vannordstrand and finds nothing therein to raise a material question of fact regarding pretext. "Even though all doubts concerning pretext must be resolved in plaintiff's favor, a plaintiff's allegations alone will not defeat summary judgment. Mere conjecture that the employer's explanation is pretext is insufficient basis to defeat summary judgment." *Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1267 (10th Cir.2007) (citation and quotations omitted).

Having reviewed all evidence of record, the court finds that plaintiff has failed to present facts suggesting that the defendant's "proffered [national origin neutral] reasons were so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief." *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir.2006).  Accordingly, summary judgment is warranted on plaintiff's claims of national origin discrimination.

22

**Retaliation**

Plaintiff seeks to prove his claim of retaliation indirectly, using the *McDonnell Douglas* framework. To establish a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) he engaged in protected opposition to discrimination; (2) a reasonable employee would have found the challenged action to be materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action. *See Burlington N. & Santa Fe Ry. Co. v. White*, __ U.S. __, 126 S.Ct. 2405, 2414-15 (2006); *Somoza,* 513 F.3d 1206; *Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007). If plaintiff makes the prima facie showing, the defendant must proffer a legitimate, nondiscriminatory reason for his termination. Plaintiff then has the burden of demonstrating that the defendant's asserted reasons for his termination are pretextual. *Fye v. Oklahoma Corp. Com'n,* 516 F.3d 1217, 1227 (10th Cir.2008).

The standard requires *material* adversity because "it is important to separate significant from trivial harms." *Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2415 (2006). Title VII does not establish "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998); *See Somoza*, 513 F.3d at

1214-15. The challenged action is materially adverse if "it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Burlington Northern and Santa Fe Ry. Co. v. White*, __ U.S. __, 126 S.Ct. 2405, 2415 (2006), quoting *Rochon*, 438 F.3d, at 1219 (quoting *Washington*, 420 F.3d, at 662).

Plaintiff rests his claim of protected conduct solely on the grievances pressed on his behalf by the union. Use of the employer's internal grievance procedures constitutes protected activity under Title VII. *See Robbins v. Jefferson County Sch. Dist. R-1*, 186 F.3d 1253, 1258 (10th Cir.1999), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

The record shows that only one grievance, the grievance filed on September 3, 2003 regarding plaintiff's discipline of August 25, 2003, was filed prior to plaintiff's termination.[4] This grievance, received by supervisor

---

[4]Plaintiff additionally claims that a grievance was filed regarding his March 5, 2003 discipline, but the document referenced by plaintiff has not been shown to have been presented to defendant in any manner and its form is not the same as the grievances admittedly filed. It appears to be a draft of a grievance, containing notes by the union president. *Compare* Dk. 34, Exh. 6 *with* Dk. 31, Exh. 19. The evidence fails to show that defendant knew of any grievance prior to plaintiff's termination except the one filed on September 3rd.

Keefe on September 3, 2003, alleges that "other operators have made worse 'mistakes' and have had no discipline actions at all against them," and that "you have repeatedly discriminated against [plaintiff] because of his national origin and did so during the meeting on 8-25-03." Dk.31, Exh. 19. This is sufficient to show that plaintiff raised the issue of national origin discrimination to his immediate supervisor on September 3rd.  Because this complaint was within ten days of plaintiff's termination, an inference of causal connection is raised. *See Fye,* 516 F.3d at 1228. Additionally, a reasonable employee would have found termination to be "materially adverse." Plaintiff has thus shown a prima facie case of retaliation. *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir.1999) (termination is an adverse employment action under the ADA); *See Pastran v. K-Mart Corp.* ,210 F.3d 1201, 1205 (10th Cir. 2000).

Here, as above, defendant has offered a legitimate, nondiscriminatory reason for plaintiff's termination, in stating that despite numerous warnings, plaintiff's job performance did not improve and was ultimately unsatisfactory. Plaintiff thus bears the burden of demonstrating that the defendant's asserted reasons for his termination are pretextual.

A plaintiff may carry his burden through a combination of his prima

facie case and the presentation of "sufficient evidence to find that the employer's asserted justification is false." *Reeves*, 530 U.S. at 148.FN3 Specifically, when considering pretext, "we examine the facts as they appear to the person making the decision to terminate the plaintiff." *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1261 (10th Cir.2001) (internal citation and quotation marks omitted).

Here, as with plaintiff's claim of discrimination, plaintiff has failed on this count. The court additionally notes that even after defendant received plaintiff's grievance on September 3rd, defendant did not terminate plaintiff for his next failing, but instead issued on September 9th a second pretermination warning. *See* Dk. 31, Exh.16, 17. The fact that defendant gave plaintiff yet another opportunity to improve his performance instead of terminating him cuts against a finding of retaliation. Based on the record, no reasonable jury could find that defendant's stated reasons for its treatment of plaintiff are a pretext for retaliation.

IT IS THEREFORE ORDERED that defendant's motion for summary judgment (Dk. 26, revised by 31) is granted.

Dated this 20th day of May, 2008.

s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge